IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| APRIL DEAVON MINER, | ) | Case No. 5:22-cv-2058 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, April Deavon Miner, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act.  Miner challenges the Administrative Law Judge's ("ALJ") negative findings.  Miner argues that the ALJ misapplied *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), in his evaluation of evidence of her mental health-related impairments.  She further argues that the ALJ misevaluated the opinion evidence and her subjective symptom complaints.

Because the ALJ failed to adequately explain his findings regarding and/or misevaluated Miner's physical health-related subjective symptom complaints, I recommend that the Commissioner's final decision denying Miner's application for SSI be VACATED on that issue and that Miner's case be REMANDED for further consideration.  In all other respects, I recommend the final decision of the Commissioner be affirmed.

I.      **Procedural History**

On April 8, 2014, Miner applied for SSI, alleging that she became disabled on January

31, 2014.  (Tr. 73).[1]  The conditions considered as part of that application included: (i) anxiety;

(ii) borderline personality disorder; (iii) depression; (iv) diabetes; (v) a history of learning

disability; and (vi) migraine headaches.  *See* (Tr. 75–76, 79–81).  The Social Security

Administration denied Miner's application initially and upon reconsideration.  (Tr. 73).  ALJ

Mary Lohr heard Miner's application on May 24, 2016 and denied Miner's application in an

August 2, 2016 decision.  (Tr. 73, 83).  In doing so, the ALJ determined that Miner had the

residual functional capacity ("RFC") to perform work at all exertional levels, except that:

> [Miner] is limited to the performance of unskilled work, consisting of simple,
> routine tasks, undertaken in a work setting free of fast-paced production
> requirements, demands or quotas [but with no corresponding prohibition intended
> against goal oriented work], which setting imposes only occasional and
> superficial interaction with co-workers and the public, which setting contemplates
> the imposition of infrequent workplace changes, easily explained.  * * *

(Tr. 78) (second set of brackets in original).

On September 2, 2020, Miner reapplied for SSI.  (Tr. 198).  Miner alleged that she

became disabled on April 1, 2011, due to: (i) depression; (ii) anxiety; (iii) neuropathy;

(iv) diabetes; and (v) hyperthyroidism.  (Tr. 198, 212).  Her application was denied initially and

upon reconsideration.  (Tr. 90–98, 100–09).  ALJ Michael F. Schmitz heard Miner's case on

September 17, 2021 and denied her application in a November 3, 2021 decision.  (Tr. 16–27,

32-59).  This time, the ALJ determined that Miner had the RFC to perform work at the light

exertional level, except:

> [Miner] can never climb ladders, ropes, or scaffolds; occasionally climb ramps or
> stairs, stoop, kneel, crouch, or crawl; frequently balance; frequently reach, handle,
> or finger with her bilateral upper extremities; she must avoid concentrated
> exposure to extreme cold and vibrations; and she must avoid all exposure to

---

[1] The administrative transcript can be found in ECF Doc. 7.

hazards such as unprotected heights, moving mechanical parts, or commercial driving.  She can perform simple, routine and repetitive tasks, but not tasks which require a high production-rate pace, such as assembly line work, and she make only simple work-related decisions.  She can interact occasionally with supervisors and coworkers, but can have no more than incidental contact with the public.  All interactions should be superficial, meaning no sales, arbitration, negotiation conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasive of others; and she can tolerate occasional changes in a routine work setting, so long as such changes are easily explained, and/or demonstrated in advance of gradual implementation.

(Tr. 21).

On September 16, 2022, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–3).  On November 15, 2022, Miner filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Miner was born on April 11, 1992; she was 18 years old on the alleged onset date, 28 years old at the beginning of the period under consideration, and 29 years old at the end of the period under consideration.  (Tr. 198).  Miner had a high school education, with no specialized or vocational training.  (Tr. 42, 213).  The ALJ determined that Miner had no past relevant work. (Tr. 25).

### B.     Relevant Medical Evidence

#### 1.     Physical Health-Related

Miner's medical history at the time she filed her SSI application included various conditions with an onset date of November 9, 2018: (i) essential hypertension; (ii) hyperlipidemia; (iii) hypothyroidism; (iv) type 2 diabetes mellitus; and (v) vitamin D deficiency.  (Tr. 354).  Miner treated her diabetes with atorvastatin and insulin injections. (Tr. 353).

3

On December 6, 2019, Miner visited Jessica Klaus, PA-C, reporting that she was "doing well with blood sugars." (Tr. 351). Miner reported that she did not exercise but had been "[c]ha[s]ing" her two-year-old daughter around. (Tr. 356). She also reported inconsistent appetite, nausea, and no more than three hours of sleep. *Id.* Her physical examination results were remarkable for benign mastoids, epigastric tenderness, and widely patent uvula. (Tr. 357). PA Klaus prescribed alcohol pads, glipizide, and alcohol pads for Miner's diabetes. (Tr. 358).

On June 8, 2020, Miner reported to PA Klaus in a telehealth appointment that she was experiencing: (i) chest pain with tachycardia after eating; (ii) ear pain which radiated from her chest pain; (iii) excess weight gain; (iii) fatigue; and (iv) leg cramps at night. (Tr. 347, 350). Miner also reported shoulder pain, which she'd had off and on for a year but became constant "1-2 months ago." (Tr. 350). Miner rated her pain as 10/10 in severity, with radiation down her left side to her leg, which was not improved with ibuprofen or Tylenol. *Id.* Miner reported that the pain caused her fatigue when changing her daughter's diaper and holding groceries. *Id.* PA Klaus ordered chest x-rays and instructed Klaus to call an endocrinologist. (Tr. 351). PA Klaus also prescribed tizanidine. *Id.*

On June 23, 2020, Miner reported to PA Klaus a sore throat, tingling, and feeling as though she was gaining weight. (Tr. 342, 346). She reported that her blood sugar readings were between 96 and 260. (Tr. 346). She also reported that she "has been walking her daughter to the park where they live." *Id.* Miner's physical examination results were remarkable for appearing obese, benign mastoids, and widely patent uvula. *Id.* PA Klaus advised Miner on lifestyle modifications to reduce her weight. *See* (Tr. 347).

Between June and August 2020, Miner wrote to PA Klaus various medical questions. *See* (Tr. 340). On July 31, 2020, Miner wrote to PA Klaus that she'd started a new part-time job

4

working "12 hours a day." *Id.*  On August 21, 2020, Miner reported that she'd applied for disability, stating that she "literally can't keep a job due to the pain in my hands and legs." *Id.* She reported that she was unable to keep her part-time job, stating that she "was hurting after standing up for more th[a]n 5 minutes." *Id.*

On August 26, 2020, Miner reported to PA Klaus experiencing fatigue, leg edema, and numbness in her feet.  (Tr. 336, 340).  She reported that her blood sugar readings were "in the 200s" throughout the day.  (Tr. 340).  Miner's physical examination results were remarkable for appearing obese and mild edema in her lower extremities.  (Tr. 341).  PA Klaus diagnosed Miner with diabetic peripheral neuropathy and prescribed duloxetine.  (Tr. 342).  PA Klaus also prescribed furosemide for shortness of breath and levothyroxine for hypothyroidism.  *Id.*

On September 28, 2020, Miner reported to PA Klaus during a telehealth appointment that: (i) she felt "good"; (ii) she had been "walking ever[y] night"; (iii) she was limiting her sugar intake; and (iv) she had not cooked in grease in two months.  (Tr. 332).  She reported that her most recent blood sugar reading was 120.  *Id.*  PA Klaus refilled Miner's diabetes-related medication prescriptions.  (Tr. 336).

On December 10, 2020, Miner attended a telehealth appointment with Dawn French, ACNP, for a gastroenterology visit.  (Tr. 294).  In addition to gastrointestinal symptoms, Miner reported: (i) chest pain/pressure; (ii) fatigue; (iii) joint pain/swelling; (iv) leg pain with walking; (v) muscle tenderness and weakness; and (vi) palpitations.  (Tr. 294, 297).  Nurse Practitioner French diagnosed Miner with upper abdominal pain, heartburn, indigestion, altered bowel function.  (Tr. 297–98).

On January 13, 2021, Miner reported to PA Klaus that her blood sugar levels improved with medication compliance, but her thyroid hormone levels had increased.  (Tr. 326, 329).  Her

5

physical examination results were remarkable for appearing obese.  (Tr. 331).  Lab test results were remarkable for a blood sugar level of 178.  (Tr. 329).  PA Klaus refilled Miner's medication and advised her to continue with diet modifications and increase her physical activity.  (Tr. 331).

On February 2, 2021, Miner reported to PA Klaus during a telehealth visit that she had chest pain which had started "3 months ago."  (Tr. 322, 325).  Miner also reported back pain and numbness in her left arm and jaw.  (Tr. 325).  She reported that her "legs and feet [were] scalding hot at night" and that "after sitting for 15-20 minutes she will get out of breath just standing up." *Id.*  PA Klaus diagnosed Miner with chest pain and neuropathy.  *Id.*  PA Klaus prescribed pregabalin to treat Miner's worsening neuropathy pain.  *Id.*

On March 10, 2021, Miner reported to Nurse Practitioner French abdominal pain and heartburn.  (Tr. 289, 291).  Miner also reported: (i) fatigue; (ii) joint pain and swelling; and (iii) muscle tenderness and weakness.  (Tr. 292).  Her physical examination results were remarkable for "soft rounded" abdomen.  *Id.*

On April 19, 2021, Miner reported to PA Klaus myalgia in her left shoulder and left-sided tingling and numbness.  (Tr. 317, 320).  Her physical examination results were remarkable for appearing obese and a blackhead with a cyst.  (Tr. 321).  PA Klaus noted that a CT scan of Miner's abdomen showed "arthritis in the spine."  (Tr. 320).  PA Klaus refilled Miner's diabetes medication.  (Tr. 321).

On June 9, 2021, Miner visited Omar Zmeili, MD, for an endocrinology assessment into her thyroid problems.  (Tr. 613).  Miner reported fatigue, constipation, and cold intolerance.  *Id.* Her physical examination results were unremarkable.  (Tr. 617).  Dr. Zmeili diagnosed Miner with hypothyroidism.  (Tr. 618).

On July 26, 2021, Miner reported to PA Klaus that she had experienced upper back pain. (Tr. 546, 551–52).  She reported that she'd had back pain for a year, but it had worsened in the previous months.  (Tr. 551).  Miner also reported left-sided numbness and tingling which affected her arm, face, foot, hand, and shoulder.  *Id.*  She reported that prolonged walking caused aching pain in her low back.  *Id.*  And she reported that her left leg weakness made it difficult to climb stairs.  (Tr. 552).  Her physical examination results were remarkable for: (i) appearing obese; (ii) abnormal heel-to-toe walk; (iii) reduced strength with shoulder abduction (3/5), elbow flexion and extension (4/5), grip (3/5), and hip flexion (3/5); (iv) reduced reflexes (0-1/4); and (v) slightly impaired finger-to-nose coordination.  (Tr. 552).  PA Klaus diagnosed Miner with left hemiparesis, cervical radiculopathy, and lumbar radiculopathy.  (Tr. 552–53).  PA Klaus ordered MRI examination.  *Id.*

On July 27, 2021, Miner visited Alliance Community Hospital's emergency department, reporting intermittent left-sided numbness in her arm and face.  (Tr. 462).  Miner reported that she'd had numbness off and on for over a year, with increasing severity.  (Tr. 462, 466).  She rated the severity of her current symptoms as "mild."  (Tr. 462).  She also reported shortness of breath.  (Tr. 467).  Miner's physical examination results were unremarkable.  (Tr. 462).  CT scan results were remarkable for "[s]mall superficial injury."  (Tr. 463–64).  Miner was discharged to home care in "Good" condition, with a diagnosis of "Numbness/tingling."  (Tr. 464).

On August 3, 2021, Miner received an MRI scan of her brain.  (Tr. 569).  The results were unremarkable.  *Id.*

On August 12, 2021, Miner visited Jule Wellner, CNP, for prenatal care.  (Tr. 523–27).  Miner denied any adverse physical symptoms.  (Tr. 526–27).  Her physical examination results were remarkable for appearing obese.  (Tr. 527).

### 2. Mental Health-Related

According to the ALJ's summary of the evidence related to Miner's previous SSI application, Miner had prior diagnoses of major depressive disorder and borderline personality disorder.  (Tr. 79).  Miner's mental status exam results through February 2016 were unremarkable.  *Id.*  And Miner ceased formal mental health-related treatment in April 2014, though she began a regimen of anti-depressants in October 2015.  (Tr. 73, 79).

On December 6, 2019, Miner followed-up with PA Klaus on her depression and anxiety.  (Tr. 356).  Miner reported that: (i) over the previous two months she didn't want to get out of bed; (ii) she had constant negative thoughts and worry, because of which her grandmother was caring for her daughter; and (iii) "she has cried so much there is nothing left."  *Id.*  PA Klaus diagnosed Miner with mixed anxiety and depressive disorder, for which PA Klaus prescribed buspirone and Prozac and referred Miner to a psychiatrist.  (Tr. 356-358).

On June 23, 2020, Miner reported to PA Klaus experiencing anxiety, depression, insomnia, and stress.  (Tr. 346).  PA Klaus diagnosed Miner with anxiety disorder and prescribed trazodone.  (Tr. 347).  Miner reported similar symptoms to Nurse Practitioner French on December 10, 2020.  (Tr. 297).

On January 13, 2021, Miner reported to PA Klaus that she'd applied for disability because of anxiety, noting that her anxiety had "limited her ability to get out of the house and take care of herself."  (Tr. 330).  She reported her symptoms as: (i) chest pain; (ii) constant worry; (iii) insomnia; and (iv) racing thoughts.  *Id.*  She also prayed "to God for hours that she won't die."  *Id.*  Miner reported that she attended counseling, "but usually gets one visit in [and] then doesn't go back [because] she gets uncomfortable."  *Id.*  PA Klaus prescribed buspirone and

duloxetine. (Tr. 331). Miner continued to describe symptoms of agitation, anxiety, depression, excess worry, and sleep disturbances to Nurse Practitioner French in March 2021. (Tr. 292).

On April 13, 2021, Miner visited Asya Gough, MA, LPC, on referral from PA Klaus for a psychological assessment. (Tr. 303). Miner reported that her anxiety symptoms included: (i) chest pain; (ii) feeling like she couldn't breathe; (iii) lack of sleep due to thoughts of death and nervousness; and (iv) paranoid thoughts that something bad would befall her or her daughter. *Id.* She reported that her depression symptoms included: (i) isolation; (ii) feeling hopeless; (iii) ruminating on past traumas; (iv) sadness; and (v) varied appetite. *Id.* Miner further reported difficulty with paying attention, impulsivity, mood lability, two past suicide attempts, and a history of self-mutilation. (Tr. 303, 307). Miner reported that her interests included going fishing, playing with her daughter, and reading the Bible. (Tr. 304). She reported that she last worked "5 years ago" for two months but was fired because "I couldn't focus." *Id.* And she reported that her symptoms persisted on a regular basis despite medication treatment. (Tr. 303). Miner's mental status exam results were remarkable for: (i) appearing disheveled; (ii) avoiding eye contact; (iii) displaying a depressed mood; (iv) having a flat affect; and (v) exhibiting a paranoid thought content and circumstantial thought process. (Tr. 307–08). Counselor Gough diagnosed Miner with chronic depression and recommend counseling services to rule out post-traumatic stress disorder ("PTSD") with a severe anxiety specifier. (Tr. 309).

On April 21, 2021, Miner reported to Counselor Gough during a telehealth appointment dreaming about her traumas at least twice per month. (Tr. 504). She reported experiencing panic attacks when exposed to similar situations, such as when they were depicted on television, during which she'd feel "like someone's sitting on my chest[.]" *Id.* She also reported a persistent belief that something bad would befall her or her daughter when either was out of the

9

house, even if her daughter stayed with close relatives.  (Tr. 503–04).  She reported being

disinterested in activities with others for over a year and detached from her family.  (Tr. 504).

She reported being irritable and having anger outbursts.  *Id.*  And she reported that trauma-

related thoughts interrupted her thinking/tasks, sleep, and activities of daily living.  *Id.*  She

claimed these symptoms were all present since her childhood.  *Id.*  Miner's mental status exam

results were remarkable for displaying a low mood and circumstantial thought process.

(Tr. 503).  Counselor Gough diagnosed Miner with PTSD.  (Tr. 504).

On April 28, 2021, Miner reported to Counselor Gough during a telehealth appointment

that she'd been "experiencing a great deal of anxiety on a daily basis that impacts her ability to

function."  (Tr. 506).  She reported she'd only left her house once since her last appointment for

a car ride, during which she experienced "minimal (i.e. 3/10) anxiety."  *Id.*  And she reported

"struggling to even take her daughter outside to play[.]"  *Id.*  Miner's mental status exam results

were remarkable for displaying a low mood and circumstantial thought process.  *Id.*

On June 8, 2021, Miner visited Megan Demos, CNP, for a psychiatric assessment.

(Tr. 513).  Miner reported her biggest concern as anxiety, which she rated at 10/10 in severity

and stated impeded her from going into stores and attending family outings.  (Tr. 513, 518).

Miner rated her depression at 9/10 in severity.  (Tr. 518).  She reported that she was having panic

attacks "about 3-4 times a week," even when relaxing watching television.  *Id.*  She also

reported: (i) a "decline in self care," which she described as showering up the three times and not

brushing her hair as much; (ii) episodes of hypomania lasting two days, followed by a crash;

(iii) impulse control issues; and (iv) trouble "staying on track and completing on thing at a time."

(Tr. 516–17).  And she reported that she used to break things when "triggered" about her past,

"but she does not so much now since she had her daughter."  (Tr. 517).  Miner's mental exam

results were remarkable for avoiding eye contact and having an overweight build.  (Tr. 517–18).
Nurse Practitioner Demos prescribed Prozac.  (Tr. 518).

On June 16, 2021, Miner reported to Counselor Gough that, with Prozac, she saw "initial improvement in her mood that resulted in her going on multiple walks outside," but "for the pas[t] few days [she felt] being on edge and irritated easily."  (Tr. 508).  Her mental status exam results were unremarkable.  *Id.*

On August 25, 2021, Miner reported to Counselor Gough that she'd just returned from a trip to Myrtle Beach, South Carolina.  (Tr. 511).  She reported that her anxiety during the trip was "20/10" in severity, noting that she worried nightly that her pregnancy meant that she was going to lose her daughter.  *Id.*  She reported that her current anxiety was "8 1/2-9/10" in severity, for which she coped by reading the Bible and listening to music.  (Tr. 511–12).  Miner's mental status exam results were remarkable for displaying a sullen mood and circumstantial thought process.  (Tr. 511).

### C.    Relevant Opinion Evidence

#### 1.    Physical Health-Related

##### a.    Consultative Examiner – Jenna Borys, DO

On February 27, 2021, Miner visited Jenna Borys, DO, for a medical evaluation. (Tr. 271).  Miner reported experiencing daily neuropathic pain in her lower back, which radiated downwards into her extremities and made it difficult for her to tolerate prolonged sitting and standing.  (Tr. 271).  She also reported a history of low back pain, an arthritis diagnosis, and medication treatment with Lyrica, which "is not helping."  *Id.*  Miner also reported on her functional limitations, stating that: (i) climbing/descending stairs was "very difficult"; (ii) her boyfriend assisted with activities of daily living and sometimes with stepping out of the

shower/bathtub; (iii) she could not pick up anything over ten pounds; (iv) she could sit and stand

for less than ten minutes before needing to change positions; (v) she occasionally used a cane;

and (vi) she was unable to walk a city block.  *Id.*  She reported that her last job was "two years

ago as a home health aide," but it was "too physical for her."  *Id.*

On physical examination, Miner had: (i) 4/5 hip, shoulder, and spine strength; (ii) 70°

lumbar spine forward flexion; (iii) poor balance for heel-to-toe walk; (iv) positive straight leg

raise test; and (v) slowed gait.  *See* (Tr. 272–73, 275–79).  Dr. Borys diagnosed Miner with

diabetic neuropathy and low back pain, stating:

> . . . Based on physical exam I am unable to identify any significant limitation.
> Subjectively with the degree of her low back pain that is reported, I would
> recommend lifting restrictions of less than 10-15 pounds.  Regarding her
> neuropathy, she is at risk of not tolerating periods where she has to stand on her
> feet for long times or ambulate far distances.  I do believe that if she were able to
> tolerate it, she could do sedentary to light duty work, perhaps at a lessened time
> frame of maybe 20 hours a week.

(Tr. 273).

### b.    Treating Source – Jessica Klaus, PA-C

On August 30, 2021, PA Klaus completed a two-page "Diabetes Mellitus Medical Source

Statement."  (Tr. 416–19) (title case added).  The form consisted of a series of fill-in-the-blank,

circle, and checkbox questions regarding the functional limitations attributable to Miner's

impairments.  *See id.*  PA Klaus's answers indicated that Miner could: (i) walk "1-2"city blocks

without rest or severe pain; (ii) sit, stand, and walk between 10-15 minutes at a time and for up to

4 hours in an 8-hour workday; (iii) lift 10 pounds occasionally and 20 pounds rarely; (iv) rarely

twist, stoop, crouch, or climb stairs; (v) never climb ladders; (vi) reach overhead with her left

arm 25-50% of the time and with her right arm 75% of the time; (vii) grasp, manipulate, and

reach forward with her left upper extremity 50% of the time and 90% of the time with her right upper extremity; (viii) not tolerate even "low stress" work. *Id.*

PA Klaus further stated that Miner needed to shift positions at will, including 10-minute walks every 15 minutes. (Tr. 417). PA Klaus stated that Miner would also need unscheduled 15-minute breaks every 2 hours and, if in a job with prolonged sitting, elevate her legs for up to 2 hours in an 8-hour workday. *Id.* PA Klaus stated that Miner's impairments would interfere with her attention and concentration to perform even simple work tasks 25% or more of the time. (Tr. 419). And PA Klaus indicated that Miner would be absent from work more than four days per month. *Id.*

### c. State Agency Consultants

On March 14, 2021, W. Scott Bolz, MD, evaluated Miner's physical capacity based on a review of the medical record. (Tr. 95–96). Dr. Bolz determined that Miner could: (i) lift 20 pounds occasionally and 10 pounds frequently; (ii) sit, stand, and walk up to 6 hours in an 8-hour workday; (iii) frequently crawl, crouch, kneel, stoop, and climb ramps and stairs; (iv) never climb ladders, ropes, or scaffolds; and (v) never work in an environment with concentrated exposure to hazards. *Id.*

On May 31, 2021, Dana Schultz, MD, concurred with Dr. Bolz's assessment of Miner's physical limitations in all but one respect. *See* (Tr. 105–07). Dr. Schultz additionally found that Miner had to avoid all exposure to hazards. (Tr. 106).

### 2. Mental Health-Related

### a. Consultative Examiner – Bryan J. Krabbe, PsyD

On March 9, 2021, Miner visited Bryan J. Krabbe, PsyD, for a psychological evaluation. (Tr. 281). Miner reported symptoms of depression, including: (i) concentration problems;

(ii) crying spells; (iii) decreased motivation; (iv) feeling hopeless; (v) low energy; (vi) insomnia; and (vii) social withdrawal.  (Tr. 283).  She also reported that she was "sad all the time," distrustful, and worried about her, her daughter's, and her mother's death.  *Id.*

In discussing her activities of daily living, Miner reported that she mostly lay in bed, sometimes interacted with her daughter, and watched television.  *Id.*  She reported that she could attend to her daily hygiene, perform household chores, shop for groceries, and prepare basic meals "but was slowed by physical pain and often has low motivation."  *Id.*  She also reported "difficulties remembering appointments and medication."  *Id.*

And in discussing her work history, Miner reported that she'd held only two jobs in her life, both home health aide positions, one which lasted three months and the other two weeks. *Id.*  Miner reported that she "had problems all the time," such as: (i) being unable to "catch on to things"; (ii) difficulties staying focused and performing tasks in a timely manner; (iii) being unable to get along with supervisors or coworkers; and (iv) problems managing stress.  *Id.*  She stated that she "always went to the bathroom because I was having panic attacks."  *Id.*

Miner's mental status exam results were remarkable for: (i) appearing sad; (ii) displaying below-average short-term memory and attention and concentration skills; and (iii) exhibiting a general intellectual functioning at below normal limits.  (Tr. 285).  Dr. Krabbe diagnosed Miner with major depressive disorder and borderline intellectual functioning. *Id.*

In the functional assessment portion of the evaluation, Dr. Krabbe did not describe functional limitations.  Dr. Krabbe instead discussed Miner's subjective statements and mental status exam results in connection with each area of mental functioning.  *See* (Tr. 286–87). Notably, Dr. Krabbe stated: (i) Miner's reported symptoms and difficulty completing both serial 7s and serial 3s tasks suggested difficulty maintaining attention and focus; (ii) Miner could

14

understand and respond to supervisor feedback and adequately relate to coworkers, though her subjective statements suggested "emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate co-worker relationships"; (iii) Miner had limited cognitive abilities, which could "result in difficulty solving problems and require excessive support"; and (iv) Miner's depression symptoms could "compromise her ability to respond to work pressures leading to increased emotional instability and withdraw." *Id.*

### b.      Treating Source – Asya D. Gough, MA, LPC

On September 7, 2021, Gough completed a two-page "Mental Impairment Questionnaire," which asked Gough to answer questions regarding Miner's mental health-related functional limitations.  (Tr. 420–21) (title case added).  Gough listed Miner's diagnoses and the frequency and length of her treatment (i.e., four months, during three of which Miner did not attend regularly).  (Tr. 420).  In describing the clinical findings which demonstrated the severity of Miner's impairment, Gough stated: "[Miner's] C-PTSD anxiety symptoms impair her ability to adequately manage them enough to function regularly outside of her home currently."  *Id.* Gough left blank the questions which asked Gough to specify functional limitations. *See* (Tr. 420–21) (sentence case added).

### c.      State Agency Consultants

On March 11, 2021, Carl Tishler, PhD, evaluated Miner's mental capacity based on a review of the medical record.  (Tr. 96–97).  Citing Acquiescence Ruling ("AR") 98-4[2], Dr. Tishler adopted the mental RFC findings from ALJ Lohr's August 2016 decision.  (Tr. 96).

---

[2] 1998 SSR LEXIS 5 (June 1, 1998).

On May 25, 2021, Kristen Haskins, PsyD, concurred with Dr. Tishler's assessment of Miner's mental capacity.  (Tr. 107).

### D.      Function Reports

#### 1.      Miner

On September 16, 2020, Miner completed an adult function report.  *See* (Tr. 221–28). Miner reported that her day consisted of watching television while sitting, preparing an easy meal, sitting down, taking her medications, and going to bed.  (Tr. 222, 227).  She reported that she cared for her child by dressing and feeding her, with assistance from the girl's father.  *Id.* Because of her inability to "lift" her hands or arms, bend, or stand without pain, she had difficulty with bathing, caring for her hair, dressing, and standing long enough to prepare a "whole" meal.  (Tr. 221–22, 225).  Miner further reported that she could vacuum one to two rooms, which would take 45 minutes, with breaks.  (Tr. 225).

Miner reported varying tolerances for standing and walking.  Miner reported that she could not stand for more than ten minutes; although on the same page, she also reported that she could barely stand for five minutes.  *Id.*  She also reported that she could walk "1-2" minutes before needing to stop and rest, needing 45 minutes to rest before continuing.  (Tr. 228).

With respect to her mental health, Miner reported that required reminders to take her medicine and sometimes to bathe.  (Tr. 225).  She reported that if she went out, which she did a "couple times a week," she likely would have a panic attack and had one "most days."  (Tr. 221, 226–27).  She reported that did not go out alone and did not shop, relying on assistance from her sisters.  (Tr. 226–27).  She reported that she could not focus, get along with authority figures, follow written or oral instructions, or handle stress or changes in routine.  (Tr. 224, 228).  She

also reported having been previously laid off because she could get along with others or follow instructions.  *See* (Tr. 228).

### 2.  Barb Gordon

On September 8, 2021, Barb Gordon, Miner's "mother in law to be," also reported on Miner's functioning.  (Tr. 260–67).  Gordon reported that Miner spent most of her day caring for her daughter, with which Gordon helped, and texting Gordon about her daily concerns. (Tr. 261).  Gordon reported that Miner had no issues with personal care, except that she could not lift her harms.  *Id*  Gordon reported that Miner could cook to the extent her neuropathy did not restrict her ability to stand.  (Tr. 262).  Gordon reported that Miner's anxiety and neuropathy pain disabled her from going outside and doing yardwork.  (Tr. 262–63).  And Gordon reported that Miner could sit and fold clothes, but it would take "awhile."  (Tr. 262).

Gordon further reported that Miner would only leave the house to attend medical appointments, because she would otherwise have panic attacks.  (Tr. 263).  Gordon reported that Miner's hobbies consisted of watching television, "when she can sit long enough [to]," and listening to music.  (Tr. 264).  Gordon reported that Miner's legs would start to go numb with prolonged sitting.  *Id.*  Gordon reported that Miner could walk "maybe 3 min sometimes 5 min" and could resume only after a rest of 45-60 minutes, but sometimes she was unable to resume walking.  (Tr. 265).

Gordon reported that Miner "sometimes" required reminders to take her medication. (Tr. 262).  Gordon reported that Miner's attention span depended on the situation and with whom she was interacting.  (Tr. 265).  Gordon reported that Miner did not follow written instructions "good" and could not follow oral instructions "unless she really trusts or knows you."  *Id.*  Gordon reported that Miner could not get along with authority figures and had previously been

17

fired for having panic attacks while at work. (Tr. 266). Gordon reported that Miner could not handle any stress or changes in routine. *Id.*

### E. Relevant Testimonial Evidence

Miner testified that what prevented her from working was, initially, anxiety and depression, because of which she could not keep up and was "let . . . go." (Tr. 43). Miner testified that she did not have panic attacks as much as before, (because she was at home and "comfortable.") *Id.* Miner stated: "[I]f I go out in public, even take a little walk and I see a car, I probably will break down and have a panic attack." (Tr. 43–44). Miner testified that she treated her mental health-related symptoms with weekly telehealth counseling sessions and medication management, but she felt that medication made her insomnia worse. (Tr. 44–45).

Physically, Miner testified that neuropathy caused her hands and legs to cramp and go numb. (Tr. 45). She testified she found herself dropping things and could barely sign her name, especially when she was under stress or when the weather changed. (Tr. 46). She testified that she needed to sit down after two to three minutes of standing, because her hands, legs, and feet would cramp and go numb. (Tr. 45). She testified she could walk up to 15 feet at a time. (Tr. 46). She also experienced constant whole-body pain, for which her medications were ineffective. (Tr. 47).

Miner further reported that at night she slept in 20-minute increments for up to 2 hours. (Tr. 44). As a result, she testified that she felt tired and took naps throughout the day. *Id.* She testified that this affected her ability to focus; she was barely able to keep appointments and was often let go early from her counseling session due to her tired appearance. (Tr. 49, 50). She also testified that she got lightheaded when her sugar levels were high. (Tr. 50–51).

Miner testified that she lived with her boyfriend and three-year old daughter.  (Tr. 41).

Although she performed some household chores, Miner testified that she received assistance

from her and her boyfriend's mothers.  (Tr. 41–42).  She testified that the day before the hearing:

(i) she sat on the couch; (ii) her boyfriend's mother brought breakfast; (iii) she changed clothes;

(iv) she watched television; (v) she attempted, but could not finish, washing dishes; (vi) and went

to bed.  (Tr. 48).

Vocational expert ("VE") Karrie Grady testified that an individual with the ALJ's

hypothetical limitations could perform work at the light exertional level as a cleaner, an inspector

and hand packager, and a routing clerk.  (Tr. 52, 54–55).  If further limited to work at the

sedentary exertional level, the VE testified that the individual could work as a document

preparer, a surveillance system monitor, and a nut sorter.  (Tr. 55).  If limited to occasional reach

or occasional handling and fingering, the VE testified that the individual could only work as a

surveillance system monitor.  (Tr. 55–56).  But if limited to working in isolation, the VE testified

there would be no jobs available.  (Tr. 56–57).

The VE further testified that an employer would not tolerate more than 15% off task

behavior, consistent absences, or more than six absences per year.  (Tr. 57).  The VE testified

that the need to elevate one's legs during the workday would be work preclusive.  (Tr. 57–58).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is

limited to deciding "whether the ALJ applied the correct legal standards and whether the findings

of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the

relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.     Effect of Prior ALJ Decision

Miner argues that the ALJ misapplied the Sixth Circuit's *Drummond* decision in his evaluation of her mental health-related impairments, because the ALJ gave res judicata effect to the prior ALJ's mental RFC findings and failed to give a "fresh look" at new evidence relevant to a different period of disability.  *See* ECF Doc. 8 at 8–9.  Miner also argues that the ALJ could not rely on the opinion of the state agency consultants, because they had not considered evidence submitted after the first ALJ's decision.[3]  ECF Doc. 8 at 10.  The Commissioner disagrees, contending that the ALJ correctly applied the Sixth Circuit's refined expression of the *Drummond* standard, found in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).  ECF Doc. 10 at 7–9.

---

[3] Miner cites caselaw related to the ALJ's obligation to supplement the record with a new consultative opinion when the record contains no opinion evidence or only outdated non-examining state agency opinions.  ECF Doc. 8 at 10 (citing *Gonzales v. Comm'r of Soc. Sec.*, 3:21-CV-00093, 2022 U.S. Dist. LEXIS 49168 (N.D. Ohio Mar. 18, 2022); *Fergus v. Comm'r of Soc. Sec*, No. 5:20-CV-02612, 2022 U.S. Dist. LEXIS 44167 (N.D. Ohio Mar. 11, 2022)).  To the extent the mere citation of cases was intended to raise an issue, it fails for want of proper development; and I do not address it.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

The Sixth Circuit addressed in *Drummond* the extent to which an ALJ is bound by a prior ALJ decision, holding that an ALJ was "bound by the findings of a previous ALJ" unless there was "evidence of an improvement in a claimant's condition." 126 F.3d at 842.  In response, the Social Security Administration issued its Acquiescence Ruling AR 98-4, which interpreted *Drummond* to require that:

> When adjudicating a subsequent disability claim with an unadjudicated period under the same title as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 SSR LEXIS 5 at *9; *see also* AR 98-3(6), 1998 SSR LEXIS 4, at*7–8 (June 1, 1998) (giving an identical interpretation to *Dennard v. Sec'y of Health & Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990) (holding that the ALJ was precluded from reconsidering a prior ALJ determination that the claimant could not return to his past relevant work)).

Two decades later, the Court recognized that *Drummond* overstated the application of res judicata principles and "significantly walked [it] back."  *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 U.S. Dist. LEXIS 59034, at *6 (N.D. Ohio Mar. 29, 2021) (citing *Earley*). Although res judicata could preclude an attempt to relitigate a previously adjudicated period of alleged disability, the court stated that the same was not true when the successive application concerns a previously *unadjudicated* period.  *Earley*, 893 F.3d at 933.  Thus, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review."  *Id.*  The kind of review *Earley* requires is a "[f]resh [but] not blind review," *id.* at 933; an ALJ may consider what an earlier ALJ determined so long as he does view those findings as binding, *see id.* at 933–34.

21

Although not perfectly expressed, the ALJ applied the proper legal standards in his evaluation of Miner's mental health-related symptoms.  42 U.S.C. § 1383(c)(3); *Blakley*, 581 F.3d at 405.  Initially, I note that the ALJ decision might be read to indicate that he felt himself bound by the prior ALJ's mental health-related RFC findings.  Start with the ALJ's articulation of the rule he applied:

> . . . I must apply the principles set forth in *Drummond* . . . and *Dennard* . . . .  This precedent holds that, absent new and material evidence of improvement or deterioration in a claimant's condition, a subsequent [ALJ] *must* fully consider the findings of a previous [ALJ].

(Tr. 16) (emphasis added; citations omitted).  The ALJ did not there, or elsewhere in his decision, discuss the evolution of *Drummond* in the *Earley* decision, which, as the Commissioner pointed out, required the ALJ to take a "fresh" look at the evidence.  This could have been harmful error.  "When an individual seeks disability benefits for a distinct period of time, each application is entitled to review."  *Earley*, 893 F.3d at 933.  The lack of a citation to *Earley* is not, on its own, enough to constitute a failure to apply proper legal standards.  *See Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-cv-2015, 2020 U.S. Dist. LEXIS 135160, at *43 (N.D. Ohio July 30, 2020) ("[T]his court reviews whether the ALJ *applied proper legal standards*, not whether the ALJ provided *proper legal citations*." (Emphasis in original)).

It is apparent, from a review of the entire ALJ decision, that the ALJ *started* with the earlier-adjudication findings in regard to Miner's physical and mental health, but *then* took a fresh look at all the evidence – old and new – to decide whether there had been change in Miner's condition to warrant different conclusion from the first adjudication.  By doing this, the ALJ did not determine that he was bound, per *Drummond*, to make the same findings.  And this reflected that the ALJ *considered* the prior ALJ findings, something *Earley* expressly said he could do.  "[I]t is fair for an administrative law judge to take the view that, absent new and

22

additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Earley*, 893 F.3d at 933.

For example, in regard to Miner's physical health, the earlier adjudication had found that Miner could perform work at all exertional levels.  After considering "the entire record", the ALJ found Miner only "remains capable of light exertion tasks."  (Tr. 22)  And he imposed various postural limitations.  (Tr. 21).  From this, we can see that the ALJ started with the prior finding and concluded Miner could no longer perform, heavy or medium work but "remained capable" of light work.  By definition, this means the ALJ found Miner more restricted than the prior adjudication had found.  By doing so, the ALJ judged in a way that worked to Miner's advantage in the sequential evaluation process.  He backed up his analysis by citing the new evidence: of what Miner *could* do: walk to the park, serve as a caretaker for her young daughter and contrasted that with Miner's physical health claims.[4]  (Tr. 22).  Based on this, it would be improper for this court to credit Miner's argument that the ALJ simply found himself bound under *Drummond* to accept the findings of the prior ALJ.

The ALJ used the same approach in regard to Miner's mental health condition but reached the conclusion that there was not enough evidence to vary from what had been found before.  Take the following snippets:

> [N]ew evidence related to [Miner's] ongoing mental health treatment reflects general stability of her mental health conditions, and does not warrant any further limitations in her functional abilities. * * *
>
> [. . .]
>
> Overall, there is insufficient new and material evidence to support more than moderate limitations in this area of functioning. * * *

---

[4] As noted below, I take issue with the ALJ's findings in regard to some of these factual findings.  But, for purposes of this section – determining if the ALJ improperly followed *Drummond* – it is apparent that he reviewed the more recent medical evidence, even if that review was flawed.

. . . The record does not contain sufficient new and material evidence to depart from the prior Decision's Finding that the claimant has a moderate limitation in social functioning or interacting with others. * * *

. . . Other than [Miner's] estimated below-average intellect, there is no new and material evidence which supports any change from the prior Finding that she has a moderate limitation in her ability to concentrate, persist, or maintain pace. * * *

. . . There is insufficient new and material evidence to support worsening of [Miner's] symptoms, and she is moderately [limited.]
[. . .]

Related to her mental health, there are minimal records that can be considered as new *and* material[.]

[. . .]

. . . The prior Decision supports that [Miner] has had ongoing mental health issues since the filing date, but the record lacks substantive support of meaningful change in her condition. * * *

As was the case at the time of the prior Decision, the limited additional records continue to support [the same RFC findings.]

(Tr. 16–17, 20, 22–23) (emphasis in original).  The ALJ's main concern was that Miner had little in the way of new treatment records or medical evidence to support her claim that she was more limited in her mental health than she had been found at the time of the original adjudication.  But it is quite apparent that the ALJ "gave careful consideration [to] the entire record" in order to assess what, if anything, had changed.  And the ALJ found persuasive the opinion of state agency psychologists who adopted the mental health RFC findings from the prior ALJ decision.  *See* (Tr. 96–97, 107) (adopting "the ALJ/AC decision dated 7/28/2016 based on AR 98-4").

Considering new evidence with the old RFC as a point of comparison is precisely what *Earley* suggested was proper.  *See* 893 F.3d at 933–34.  I concur with the Commissioner's observation that the ALJ never found himself to be bound by the prior ALJ findings.  Thus, I find

24

no basis for remand based on Miner's claim that the ALJ incorrectly applied the applicable legal standards.

### C.    Step Four – Opinion Evidence

Miner argues that the ALJ committed several errors in his evaluation of the opinion evidence.  Miner argues that contrary to the ALJ's conclusion, PA Klaus's opinion was consistent with evidence documenting her neuropathy pain, numbness, and tingling.  ECF Doc. 8 at 12–13.  She argues that Dr. Borys's proposed functional limitations should not have been dismissed as vague.  ECF Doc. 8 at 13.  She argues that Counselor Gough's "opinion" regarding her ability to manage her symptoms outside the home was supported by and consistent with the medical record.  ECF Doc. 8 at 13–14.  And she argues that, despite finding Dr. Krabbe's opinion persuasive, the ALJ's RFC findings failed to incorporate Dr. Krabbe's "crucial limitations related to her difficulties maintaining attention and focus, problems solving problems, and that she would require excessive support."  ECF Doc. at 14–15.  The Commissioner disagrees.  ECF Doc. 10 at 9–14.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 416.920(e).  In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 416.920c(a).  The ALJ must, at minimum, explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 416.920c(b)(2)[5].  And when an ALJ finds persuasive some parts of a medical opinion and not others, he must explain why the

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 416.920c(c)(3)-(5).

parts of the opinion which conflict with her RFC findings were not adopted.  *See Davis v.*

*Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 U.S. Dist. LEXIS 244915, at *29 (N.D. Ohio Nov.

24, 2021) (citing SSR 96-8p, 1996 SSR LEXIS 5 at *7 (July 2, 1996)).

## 1.    PA Klaus

The ALJ arguably erred in his treatment of PA Klaus's opinion, but the error was

harmless.  In evaluating PA Klaus's opinion, the ALJ stated:

> This opinion is not persuasive, as many of its assertions are inconsistent with the
> evidence of record.  First, Ms. Klaus indicates that [Miner] can walk no more than
> 2 blocks, but shortly thereafter, indicates that [Miner] must be allowed to walk for
> 10 minutes every 15 minutes of the day.  Second, Ms. Klaus's physical exam
> notes from December 2019 and June 2020 indicate normal musculoskeletal
> strength and tone, no joint tenderness or abnormality, normal gait, and only mild
> lower extremity, without tenderness of her calves.  (Ex. C5F/41, 24-26)[.]  There
> is insufficient medical evidence to support the degree of limitations in her
> opinion.

(Tr. 25).  This analysis reflects that the ALJ considered the degree to which PA Klaus's opinion

was internally consistent and supported by her own clinical findings (supportability).  *See* 20

C.F.R. § 416.920c(1).  But the ALJ did not articulate how he considered the extent to which PA

Klaus's opinion was consistent with other opinion evidence or treatment records from other

sources, such as those of Nurse Practitioner French, Dr. Zmeili, or the Alliance Community

Hospital emergency department.  *See* 20 C.F.R. § 416.920c(2).

The ALJ's supportability determination could, as the Commissioner argues,

independently sustain the ALJ's persuasiveness finding.  *See Okonski v. Comm'r of Soc. Sec.*,

No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, at *30 (N.D. Ohio Oct. 25, 2021).  But for

that to be the case the ALJ must provide "a coherent explanation for why" the opinion was

unsupported.  *Id.*  I find that the reasons given by the ALJ do not amount to a sufficient

explanation..  That Miner could walk two city blocks "without rest or severe pain" would not

necessarily undermine PA Klaus's opinion that Miner's need to shift positions also included her need to take 10-minute walks every 15 minutes.  (Tr. 417).  That is because there is no indication of what is the length of a city block or the pace at which Miner walks those two hypothetical city blocks.  Nor could an alleged inconsistency regarding Miner's ability to walk logically serve as a basis for discounting PA Klaus's opinion on Miner's need to shift positions, her tolerance for prolonged standing and sitting, her need to elevate her legs, her capacity to lift, her stress tolerance, or her absenteeism.

The ALJ's other one-sentence reason fares no better.  The period under adjudication for Miner's successive SSI application ran from the date she reapplied for SSI (September 2, 2020) to the date of the ALJ's decision (November 3, 2021).  *See* 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016).  Viewed in that light, the physical examination results on which the ALJ relied (all of which predated the filing date) would seem of little relevance to the supportability of PA Klaus's August 30, 2021 opinion when compared to PA Klaus's most recent objective exam findings, which did contain negative findings.  *See* (Tr. 552).  And those treatment notes the ALJ did cite stand unaccompanied by any explanation of the way in which Miner's unremarkable objective exam findings did not support the many limitations espoused in PA Klaus's opinion.  *See Fleischer*, 774 F. Supp.2d at 877.

Nevertheless, I find that the ALJ's noncompliance with the regulation's articulation requirements did not cause harmful error.  *Rabbers*, 582 F.3d at 654.  An error in the ALJ's evaluation of the opinion evidence may be harmless when, among other things, the opinion was so "patently deficient that the Commissioner could not possibly credit it."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).[6]  PA Klaus's proposed functional limitations, all

---

[6] Although the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017

expressed as circled, checked, or fill-in-the blank answers unaccompanied by explanations, fall

within the patently deficient standard.  *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435,

441 (6th Cir. 2017); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 648, 474–75 (6th Cir.

2016).  Therefore, any claimed error the ALJ may have made in evaluating PA Klaus's opinion

was harmless.

### 2. Dr. Borys

I find no basis for remand on account of Miner's challenge to the ALJ's evaluation of

Dr. Borys's opinion.  The ALJ discounted Dr. Borys's opinion because:

> . . . As Dr. Borys admits, the objective evidence does not support the degree of
> limitations described, which are based on [Miner's] *reported* degree of back pain,
> and neuropathy.  The opinion is internally contradictory, and vaguely stated, using
> phraseology such as "perhaps," and "maybe."  Given these contradictions and
> ambiguities, compounded with the lack of support in the longitudinal record, the
> opinion is not persuasive.

(Tr. 24) (emphasis in original).

The ALJ's analysis reflects that he considered the degree to which Dr. Borys's own

findings support the limitations he recommended and how well Dr. Borys articulated those

limitations (supportability).  20 C.F.R. § 416.920c(c)(1).  The ALJ also considered the extent to

which the Dr. Borys's opinion found "support in the longitudinal record" (consistency).  20

C.F.R. § 416.920c(c)(2).  Unfortunately, the ALJ did not explain the basis for his consistency

determination.  *See* 20 C.F.R. § 416.920c(b)(2).

Nevertheless, any error in the ALJ's articulation of his consistency finding is harmless in

light of his supportability finding, which could independently sustain his decision to discount

---

regulations.  *See, e.g., Bookmyer v. Comm'r of Soc. Sec.*, No. 1:22-cv-1004, 2023 U.S. Dist. LEXIS
51802, at *12–13 (W.D. Mich. Mar. 27, 2023); *Oliver v. Kijakazi*, No. 3:22-CV-28, 2023 U.S. Dist.
LEXIS 47497, at *10–11 (E.D. Tenn. Mar. 21, 2023); *Wilson C. v. Comm'r of Soc. Sec.*, No. 3:20-cv-
00457, 2022 U.S. Dist. LEXIS 167311, at *17–21 (S.D. Ohio Sept. 15, 2022); *Burba v. Comm'r of Soc.
Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *11–12 (N. D. Ohio Sept. 29, 2020).

Dr. Borys's opinion.  *See Okonski*, No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, at *30.

As the ALJ observed, the opinion was internally contradictory, because Dr. Borys recommended

limitations based on Miner's subjective symptom complaints despite being unable to identify any

such limitations on objective examination.  (Tr. 273).  The ALJ could, consistent with the

regulations, discount the supportability Dr. Borys's opinion on that basis alone.  *E.g.*, *Loreto v.*

*Kijakazi*, No. 1:22-CV-1404, 2023 U.S. Dist. LEXIS 29565, at *29 (N.D. Ohio Feb. 22, 2023)

(citing *Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x 472, 473 (6th Cir. 2013)); *Robert C. v.*

*Comm'r of Soc. Sec.*, No. 2:22-cv-2409, 2023 U.S. Dist. LEXIS 29898, at *17 (S.D. Ohio Feb.

22, 2023) (citing, *inter alia*, *Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005)).  And

Dr. Borys's use of the terms "if," "perhaps," and "maybe" rendered vague his opinion about the

exertional level Miner was capable of and for how long such work could be sustained.  *Id.*

Opinions which express functional limitation in vague terms can be discounted as not describing

any functional limitations at all.  *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434

(6th Cir. 2018).  The ALJ's evaluation of Dr. Borys's opinion is, therefore, not an independent

basis for remand.

### 3.    Counselor Gough

I also find no basis for remand based on account Miner's challenge to the ALJ's

evaluation of Counselor's Gough's opinion.  In evaluating Counselor Gough's opinion, the ALJ

stated:

> [Counselor Gough's] opinion is not persuasive, as the records acknowledge that
> [Miner] has been seen by that provider for a total of 4.5 months, and "hasn't
> attended counseling regularly for the last 3 months."  (Ex. C8F)[.]  There is
> inadequate support for the stated opinion, given the short-term of the provider's
> interaction, and [Miners] lack of consistent attendance.

(Tr. 24).  This analysis reflects that the ALJ discounted Counselor Gough's opinion solely for lack of supportability.  However, the length of Counselor Gough's treatment relationship with Miner and the frequency of those visits only concern Counselor Gough's relationship with Miner, which is a regulatory factor distinct and separate from supportability.  *See* 20 C.F.R. § 416.920c(c)(3).  The ALJ's analysis of Counselor Gough's treatment relationship does not suffice to indicate whether and how he considered the mandatory supportability and consistency factors.  *See* 20 C.F.R. § 416.920c(b)(2).

Nevertheless, I find the ALJ's failure to abide by the regulation's articulation requirement harmless.  *Rabbers,* 582 F.3d at 654.  Not every utterance of a physician constitutes a "medical opinion" under the regulations.  The regulations instead define a "medical opinion" as "a statement . . . about what [the claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions" in her ability to meet the demands of work.  20 C.F.R. § 404.1513(a)(2).  Counselor Gough left blank the portions of the mental health questionnaire in which she could have conveyed the functional limitations resulting from Miner's mental health-related impairments that, according to Counselor Gough, Miner was incapable of managing outside the home.  Counselor Gough did not express functional limitation opinions  *See* (Tr. 420–21).  Thus, even though lacking, the ALJ's evaluation of Counselor Gough's mental health questionnaire, therefore, is not an independent basis for remand.

### 4.    Dr. Krabbe

Last, I find no merit to Miner's argument that the ALJ failed to make RFC findings consistent with the portions of Dr. Krabbe's opinion he found persuasive.  Contrary to Miner's argument, the ALJ did not find Dr. Krabbe's opinion wholly persuasive:

As referenced above, the claimant participated in a consultative mental health examination with Dr. Bryan Krabbe, PsyD. (Ex. C2F)[.]  Although Dr. Krabbe summarized [Miner's] subjectively reported responses during that interview, he did not articulate a substantial opinion.  Specifically, Dr. Krabbe recited the [Miner]'s performance results in memory and concentration testing exercises, which were below average in these areas, implying moderate limitations. Dr. Krabbe continued by noting that the claimant's difficulty in subtracting serial sevens and serial threes, "suggests difficulty maintaining attention and focus," but also noted that she maintained adequate persistence in answering questions. There was no reported limitation in her ability to interact with others, but [Miner] has limited interactions outside of her immediate family.  (Ex. C2F/6-7)[.]  These observations do not contain opinions of [Miner]'s functional abilities, but recite her subjectively reported symptoms, and 31ummaryze the results of basic mental status test, and are not persuasive.

Dr. Krabbe concluded by stating that [Miner]'s "limited cognitive abilities may result in difficulty solving problems and require excessive support.   She described symptoms of depression that may compromise her ability to respond to work pressures leading to increased emotional instability and withdraw." (Ex. C2F/6-7)[.]  That opinion is generally persuasive, and supported by the limited records and evidence available for review.

(Tr. 23).

Miner's argument centers around the ALJ's failure to "incorporate the crucial limitations related to her difficulties maintaining attention and focus, problems solving problems, and that she would require excessive support." ECF Doc. 8 at 14–15.  Difficulty maintaining attention and focus were among the portions of Dr. Krabbe's opinion the ALJ rejected.  Issues relating to problem solving and the need for excessive support related to Miner's ability to deal with normal pressure in a competitive work setting. *See* (Tr. 286–87).  It is apparent that the ALJ's mental RFC findings were sufficient to accommodate Dr. Krabbe's proposed limitations.  And Miner has not attempted to establish otherwise.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal quotation marks omitted).

I recommend that all of Miner's Step Four claims regarding the handling of the opinion evidence be rejected.

31

### D.        Step Four – Subjective Symptom Complaints

Miner argues that the ALJ failed to apply proper legal standards in evaluating her mental- and physical-health related subjective symptoms complaints.  Miner argues that contrary to the ALJ's decision, the evidence corroborated the functional limitations she expressed in her function report and at the administrative hearing.  *See* ECF Doc. 8 at 16–20.  She further argues that the ALJ failed to include limitations in the RFC related to her back pain, which interfered with her ability to concentrate and complete activities of daily living.  ECF Doc. 8 at 20.  The Commissioner disagrees.  ECF Doc. 10 at 14–16.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant and other evidence.  20 C.F.R. § 416.920(e).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5, at *14 (July 2, 1996).  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13–14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 649, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  If an ALJ discounts or rejects a claimant's subjective

complaints, he must clearly state her reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

### 1.    Physical Health-Related

The ALJ failed to apply legal standards in his evaluation of Miner's physical health-related subjective symptoms complaints.  42 U.S.C. § 1383(c)(3); *Blakley*, 581 F.3d at 405. After summarizing Miner's subjective symptom complaints, the ALJ concluded that they were only partially consistent with the record evidence, stating:

> Overall, even when the evidence is construed in the manner most favorable to [Miner]'s position, and reviewed with her testimony in mind, the record supports that the claimant remains capable of light exertion work tasks, and contradicts several of her allegations of limited functionality.  June 2020 records indicate that [Miner] walks to the park with her daughter, contradicting her claim that panic symptoms prevent her from leaving home, and that she is able to walk less than a block.  (Ex. C5F/30-31)[.]  The claimant is also the primary caretaker for her young daughter (3 years old during portions of the record), which implies at least occasional lifting and carrying of 20 pounds or more, and which is objectively at least a light exertion 'job' when performed truly full-time, and not merely 8 hours a day, or 40 hours a week.    I Find [*sic*] that the record supports that the claimant's pain and neuropathy symptoms prevent her from climbing ladders, ropes, or scaffolds, but that she remains able to occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl.  Similarly, in spite of reported neuropathy of her extremities, she can frequently balance, reach, handle, or finger bilaterally. Because extreme cold or vibrations are likely to exacerbate tingling or numbness of her extremities, the claimant must avoid concentrated exposure to either environment, and she must avoid all exposure to unprotected heights, moving mechanical parts, or commercial driving.

(Tr. 22).

The ALJ's reasoning failed to build an accurate and logical bridge between the evidence and his conclusion that Miner's subjective symptom complaints were only partially consistent with the evidence. *Fleischer*, 774 F. Supp.2d at 877.  The ALJ noted that Miner, "walks to the park with her daughter,"[7] and concluded that this contradicted her claim that she was unable to

---

[7] Problematically for our review, no record citation was provided to support this statement.

go outside due to panic attacks and her claim that she would not walk a full city block.  But the record contains no indication of the distance involved in Miner's purported walks to the park. Without that detail, Miner's walks to the park with her daughter would not necessarily be inconsistent with her reported inability to walk further than a city block.  *See* (Tr. 346).  The ALJ also discounted Miner's statements regarding her physical limitations based on his conclusion that she was "the primary caretaker" of her daughter, "which implies at least occasional lifting and carrying of 20 pounds or more, and which is objectively at least a light exertion 'job.'" (Tr. 22).  The ALJ cited nothing to show where his "primary caretaker" conclusion came from. Arguably, it might have come from Miner's Adult Function Report:

> "7.  Do you take care of anyone else such as a wife/husband, children, grandchildren, parents, friends, other?  If "YES" for whom do you care and what do you do for them? [Miner responded] "YES[;]" "child, get her dressed, feed her."

But Miner also stated repeatedly in the record that she lived with and received child-rearing assistance from her boyfriend.  *See* (Tr. 222, 261, 271, 303).  And she stated, as cited in the fact section above, that her mother and boyfriend's mother were with her ninety percent of the time and provided childcare assistance.  I find that the ALJ failed to build a logical bridge between his conclusions about Miner's physical capabilities – resulting from her childcare activities – and the record, which does not show her to be the primary caregiver of her child.  Moreover,  being able to feed and dress one's child does not necessarily mean that Miner had to lift her child to do so or that she could lift equivalent weight for up to two hours in an eight-hour workday.  *See* SSR 83-10, 1983 SSR LEXIS 30, at *13 (defining "Occasionally" to mean "very little up to one-third of the time," or "no more than about 2 hours of an 8-hour workday").  And, in addition to the aforementioned logical gaps, the ALJ gave *no* explanation for the basis upon which he found the record to be inconsistent with Miner's claimed inability to "stand, walk, or bend without

pain," "difficulty negotiating stairs," and difficulty sitting or standing for "fewer than 10 minutes[.]"  (Tr. 21–22).  Nor did the ALJ explain the basis for not fully crediting Miner's reported manipulative limitations.  (Tr. 46).

The regulations require an explanation of "which of an individual's symptoms [the ALJ] found consistent or inconsistent with the evidence . . . and how our evaluation of the individual's symptoms led to [the ALJ's] conclusions."  SSR 16-3p, 2016 SSR LEXIS 4, at *21.  The ALJ only partly complied with that requirement.  And the extent to which he did was based on reasons which failed to build an accurate and logical bridge between the evidence and his conclusion.  *Fleischer*, 774 F. Supp.2d at 877.  The error was not harmless.  Miner's claimed limitations with lifting, sitting, and standing potentially could preclude work even at the sedentary exertional level.  *See* SSR 83-10, 1983 SSR LEXIS 30, at *12–13.  Thus, I find that a remand is warranted to permit the ALJ to reconsider Miner's subjective symptom complaints regarding her physical health-related symptoms and to fully articulate findings in a way that satisfies the regulations.

### 2.      Mental Health-Related

It was plain that the ALJ resolved Miner's mental health limitations claims as he did because he found the record of Miner's mental health treatments to be minimal.  A review of the administrative transcript confirms this conclusion.  There appear to be thirty-six pages of medical and treatment records relating to mental health counseling and treatment.  (Tr. 301-316; 503-522).  The ALJ found nothing in those records to support a conclusion that Miner's mental health condition had undergone a significant change from the prior adjudication.  Thus, the ALJ had a basis upon which to discount Miner's subjective symptom complaints regarding her mental health condition.  I do not recommend remand for the reevaluation of Miner's mental health

condition; however, to the extent the ALJ chooses to examine any later developed or more complete record of Miner's mental health status upon remand to reexamine Miner's physical health limitations, the Commissioner may reach a different conclusion on Miner's mental health functional limitations.

### E.   Step Four – RFC Definition of "Superficial"

Miner argues that the ALJ's definition of "superficial" in his RFC findings "inaccurately expanded" its definition to an extent that "was contrary to the definition as established by the Courts[.]" ECF Doc. 8 at 21–22.  The Commissioner disagrees.  ECF Doc. 10 at 16–17.

The Commissioner correctly asserts that plaintiff has failed to cite authority to support this argument.  And I concur that there is no regulatory definition of "superficial" interaction from which the ALJ allegedly strayed.  This court has previously affirmed when an ALJ has used the same term – 'superficial' – challenged here.  *See, e.g., Sharpe v. Comm'r Soc. Sec.*, No. 20-cv-2723, 2022 U.S. Dist. LEXIS 106311 (N.D. Ohio April 1, 2022).  Finally, Miner's failure to raise an objection to the use of the term at the ALJ hearing effectively forfeited her right to assert that issue now.  Thus, I do not recommend remand based on any claimed insufficiency in the ALJ's use of the term "superficial interaction" in his RFC finding.

## IV.     Recommendation

Because the ALJ did not adequately explain his findings for and/or misevaluated Miner's physical health-related subjective symptom complaints, I recommend that the Commissioner's final decision denying Miner's application for SSI be vacated and that Miner's case be remanded for further consideration.  In all other respects, I recommend that the Commissioner's final decision be affirmed.

Dated: July 11, 2023

Thomas M. Parker
United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).